**Ivery SWEEZY, Petitioner,**

v.

**Sam P. GARRISON, Warden, and the State of North Carolina, Respondents.**

**Civ. No. A–C–81–109.**

United States District Court,
W.D. North Carolina,
Asheville Division.

Feb. 28, 1982.

Charles T.L. Anderson, N.C. Prisoner Legal Services, Inc., Durham, N.C., Gary S. Cash, Asheville, N.C., for petitioner.

Richard N. League, Sp. Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., for respondents.

## MEMORANDUM OF DECISION

WOODROW WILSON JONES, Chief Judge.

Petitioner, a state prisoner, seeks federal habeas corpus relief, pursuant to 28 U.S.C. Section 2254, claiming that he is being unlawfully held in state custody for the following reasons:

A. that he was incompetent to assist in his defense at trial, and

B. that he was denied effective assistance of counsel.

## STATEMENT OF CASE

The Attorney General of North Carolina answered, moved to dismiss, and furnished this court with numerous documents relating to the proceedings in state court, including a copy of the trial transcript.

The petitioner, *pro se,* filed a paper writing entitled "Motion to Amend," from which the court ascertained the petitioner was attempting to expand the allegations above or to submit additional allegations. The "Motion" was overly broad and ambiguous to the extent this court could not determine its purpose. The petitioner and his attorney were advised by order that it was necessary for a supplemental application to be filed so that this court could properly consider petitioner's claims. Petitioner's attorney (Charles T.L. Anderson, 2727 Hillsborough Road, Durham, North Carolina 27705) did not respond to this court's directive. Petitioner, however, did respond, *pro se,* stating:

C. that he was on drugs before, at, and after trial;

D. that he was convicted by an all-white jury;

E. that there was insufficient proof of his guilt; and

F. that the grand jury should not have indicted him and a transcript of trial should be subpoenaed.

*Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 654 (1972).

Petitioner was convicted at the January 26, 1976, session of Superior Court for Cleveland County, North Carolina, of first-degree burglary in case number 10545 and was sentenced to life imprisonment. He appealed his conviction to the North Carolina Supreme Court, which court, in an opinion filed December 21, 1976, and reported at 291 N.C. 366, 230 S.E.2d 524, found no error. At trial and on appeal, petitioner was represented by Michael K. Hodnett and Fred A. Flowers. Petitioner sought postconviction relief, *pro se,* in the Superior Court of Cleveland County on February 14 and May 27, 1977. He withdrew his first application, and Judge Thornburg denied petitioner relief on the second application on June 28, 1977, without a hearing. Petitioner applied for and received appointment of counsel, William E. Lamb, Jr., for the purpose of seeking a writ of certiorari from the North Carolina Court of Appeals to review Judge Thornburg's denial order. However, Mr. Lamb's application on behalf of petitioner was denied by the North Carolina Court of Appeals on November 7, 1978.

It appears to the court that, in the context of his state applications for postconviction relief, contentions (C) through (F) recited above are secondary claims relating to and included in his allegations (A) and (B). Petitioner presented allegations (A) and (B) to the North Carolina courts in his postconviction application and sought appellate review of the denial of same. He did not, however, further proceed to the North Carolina Supreme Court as he should have done to completely exhaust his state remedies.

Petitioner has not, therefore, completely exhausted his state remedies as required by 28 U.S.C. Section 2254. *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Patterson v. Leeke,* 556 F.2d 1168 (4th Cir.1977), *cert. denied,* 434 U.S. 929, 98 S.Ct. 414, 54 L.Ed.2d 289 (1977). Title 28 U.S.C. Section 2254(b) provides that a writ of habeas corpus shall not be granted by a federal court unless it is apparent that the applicant has exhausted the remedies available in the courts of the state, or that there is either an absence of available state corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner. *Strader v. Troy,* 571 F.2d 1263 (4th Cir.1978). Petitioner has neither exhausted his state remedies nor alleged and shown that there is an absence of available state corrective process or the existence of circumstances rendering such process ineffective as to his allegations. Inasmuch as all the remedies available in state courts as to all the petitioner's allegations have not been exhausted, the relief request cannot be granted. *Thompson v. Peyton,* 406 F.2d 473 (4th Cir. 1968); *Ganger v. Peyton,* 379 F.2d 709 (4th Cir.1967). However, even if state remedies have been exhausted, a petitioner is not entitled to federal habeas corpus relief if his allegations are without merit. *Jenkins v. Fitzberger,* 440 F.2d 1188 (4th Cir.1971). The Attorney General of North Carolina states in his answer that he waives the requirement of further exhaustion; therefore, this court will examine petitioner's claims on the merits. *Strader v. Allsbrook,* 656 F.2d 67 (4th Cir.1981); *Jenkins v. Fitzberger, supra.*

The state offered evidence which showed the following:

Mrs. William R. Grigg (Mrs. Connie Grigg) was married to William R. Grigg and was living between Lawndale and Polkville. On September 7, 1975, she was at her home at Route 1, Lawndale, where she ran a ceramic shop which was located to the rear of the house. Her two children were in the house on this occasion. She said on the night in question she had gone to the ceramic shop at approximately 10:00 and had returned, closed the outside door to the porch, and heard a click when she reentered the house from her ceramic shop. Her oven in the ceramic shop was on and had to be watched about every hour and a half. She said that she reentered the house and that her husband was in the front room, had a headache on

this occasion, and had fallen asleep. She had gotten her son to bed about 9:00 and her daughter about 11:00 p.m. and had then gone to the bathroom and was rolling up her hair. The light in the bathroom was on and had a hundred or hundred and fifty watt bulb. The dining room lights were also on, and there were two bulbs in there located in a chandelier in the center of the dining room. She testified that the light from the dining room and the light from the bathroom lit up the porch and that it was not necessary for them to burn the light on the porch, which was located adjacent to the living room and the bath, when these other lights were on.

She stated that while she was in the bathroom rolling up her hair she heard some noises, decided to disregard them, and continued rolling up her hair. She walked to the entrance to the dining room. There was no screen on the outside door of the porch. Her husband had put this door up on the Saturday before this day. There were some deep freezes located on the porch, and there was a hutch located in the dining room. She walked over to that piece of furniture and picked up some bills she was considering paying the next day and then walked to the door between the porch and the dining room. She testified that as she did this she saw a man there, a black man, and that he had a woman's stocking over his arm. He was inside the porch, was beginning to step up, and that one foot was inside the porch, the other foot was on the steps leading up to the porch, and the other hand was on the outside of the door. She said she observed him about two minutes, the light was on him and she saw him, and she began screaming. The man began saying "s-h-h-h" and motioning for her to come toward him. She testified that she screamed and froze, observed him for about two minutes, and screamed again. Then she ran through the house to awaken her husband, who was sleeping in the living room. She testified the man who was at the door and opened the door and had his hand inside was the petitioner, Ivey Sweezy, Jr.

On cross-examination, she testified she did not see any scars about his face on this occasion.

She further testified, on direct examination, that the petitioner was wearing blue trousers and a blue, short-sleeved shirt on the occasion in question. She said of Sweezy, "He is the man that was in my house on this occasion."

On cross-examination, she said she could identify white people better than black people.

Petitioner, by his own testimony and that of several other witnesses, offered evidence to show that he was in Hickory, North Carolina, at the time the crime was allegedly committed.

## II. ALLEGATIONS

Petitioner is entitled to no relief on either of his contentions—(A), that he was incompetent at the time of his trial; and (B), that his lawyer rendered him ineffective assistance of counsel by not attempting to have the trial interrupted for a mental examination, and that the trial judge denied him due process by not ordering such an examination *sua sponte*. Petitioner bases each of his claims on essentially three things: (1) a history of mental illness; (2) a prior aversion to taking medication which would keep his illness in remission; and (3) disruptive behavior during trial. None of these, however, are conclusive as evidence of petitioner's incompetency at the time he was tried. With regard to the first, petitioner's history of mental illness had resulted in two pretrial competency reviews, with each resulting in an opinion that petitioner was competent to stand trial. As there was no reason advanced to view the two reports as inaccurate, the trial properly proceeded. *United States v. Bradley,* 463 F.2d 808 (D.C.Cir.1972). This was made manifest by the reports from petitioner's prior hospitalizations, which indicated that drug therapy was effective in bringing petitioner back to normal. Along the same line, and with regard to the second—peti-

tioner's aversion to taking medication—his history did include some past refusals in this regard. However, these were short-lived, for at each discharge petitioner was again on medication. More importantly, his medical records from the Cleveland County Jail which were forwarded to this court as attachments to petitioner's state court certiorari application showed daily dosages of drugs being administered to petitioner before, during, and after trial. Therefore, nothing else appearing, neither petitioner's attorney nor the trial judge can be faulted for not interrupting the trial for a mental examination of petitioner. In view of the foregoing, the first two contentions are not indicative of incompetency except to the extent they are necessarily brought into focus by petitioner's disruptive behavior at trial.

Petitioner's at-trial behavior, however, negates incompetence, as his at-trial behavior is more explainable in terms of an angry, hostile personality rather than in terms of incompetence.

The trial judge exercised considerable forebearance in light of petitioner's repeated, abusive outbursts. He expressly warned petitioner that his continued interruptions would require his removal. Petitioner was so warned on four occasions before he was removed from the courtroom for the first time. The trial judge exercised his contempt powers four times in attempts to control petitioner's behavior so that he could remain present throughout the trial. Even in removing petitioner from the courtroom, the trial judge attempted to mitigate the adverse consequences of petitioner's absence from the trial. On each occasion, the judge excused the jury before having petitioner removed in order to prevent any possible prejudice to petitioner. He specifically informed petitioner that he could return to the courtroom as soon as he decided to conduct himself in a proper manner. Upon request, the trial judge placed petitioner in an adjoining room where he could confer with counsel during trial. It is apparent to this court that the trial judge took every precaution to protect the rights of the petitioner. When petitioner continued to disrupt the proceedings, he waived his right to be present at his trial, and his removal was an appropriate and necessary measure to preserve the dignity of the judicial process and to promote the efficient administration of justice. See *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

The trial court instructed the court reporter to record everything the petitioner said that was understood, and an examination of the trial transcript reveals many instances of disruptive behavior on the part of the petitioner, including the following, but not inclusive of all:

DEFENDANT: Man, I don't like no Kangaroo Court.

Tr. at 1–B, 20, 163.

DEFENDANT: Take them two women off. Just take them two women off. Just take them two off and let them put some more up there.

Tr. at 1–b.

DEFENDANT: Who me. I didn't say anything.

THE COURT: What did you say when you walked by here?

DEFENDANT: It don't make any difference what I said.

THE COURT: Yes, it makes a difference.

DEFENDANT: I whispered when I came in.

THE COURT: You better tell me what you said right now. (No response.) Let the record show that the Court ordered him to inform the Court what he said directly in the presence of the Court and the Court adjudges him in contempt of court. I'll pass upon you when the trial is ended.

DEFENDANT: This is a Kangaroo Court.

Tr. at 20.

DEFENDANT: I want me another lawyer. I feel like Mr. Hodnett and them are not going to represent me properly.

THE COURT: You sit down. You have an attorney.

DEFENDANT: I feel like he's not going to represent me properly.

THE COURT: Do you hear me? You have two fine attorneys there and they are representing you properly and I better not hear any more of these outbursts. You continue this and I'm going to gag you. I'm giving you fair warning. You continue the outbursts in the presence of this Court and I'm going to have you gagged, do you understand that? Let the record so show.

DEFENDANT: I know my constitutional rights and my right to speak for myself. Tr. at 21.

DEFENDANT: You trying to say my mama don't care nothing about me. I know my mama don't care nothing about me.

THE COURT: I'm going to tell you one thing, Mr. Sweezy. This is the third time this morning this Court has had to call you down and I'm giving you warning right now. You look at me and you pay attention to what I am saying. Let the record show I am advising him pursuant to Illinois vs Allen ( [397 U.S. 337] 90 S.Ct. 1057 [25 L.Ed.2d 353] ) and State vs Brown (19 N.C. App. 480 [199 S.E.2d 134] ).

I'm warning you I am going to remove you from this courtroom if this conduct continues and we will proceed with the trial even though you're not here. I'm also advising you that if you are removed, and this Court will remove you if you persist in this type of conduct, you can regain your privilege to be present in Open Court if you are willing to conduct yourself with proper respect for the Court. Apparently the contempt powers do not dissuade you from what you're doing and this Court is going to take more decisive measures if you do not cease and desist from this conduct. Any question you have you may relay to either of your attorneys. Tr. at 57–58.

DEFENDANT: Don't put that man on the stand. (Mr. Flowers, Mr. Hodnett and Mr. Morris approach the bench for discussion off the record.)

THE COURT: Let the record show that at the conclusion of the examination, direct examination and cross, of the defendant's *voir dire* witness number one, both counsel for the defendant approached the bench as they properly should have done and advised the Court that the defendant has made a motion that they be removed as trial counsel in this case. Let the record further show that this Court is of the opinion that both counsel are doing a very credible job in his defense; that we are now in the trial; that this is a very serious felony; that the defendant needs counsel, and the Court will DENY his motion to remove them as counsel. All right, any further evidence on the *voir dire?* Tr. at 63–64.

DEFENDANT: You can call him off the stand now. You can step down now.

Q. Do you have any idea how much he weighs?

THE COURT: Mr. Sweezy, I'm talking to the defendant, this is the fourth time I have cautioned you. One more outburst and I'm going to remove you from the courtroom. Do you understand that?

DEFENDANT: We want the facts. Tr. at 67.

THE COURT: One more. Mr. Sheriff, you will remove him from the courtroom. Before I remove you, I'm informing you that if you can behave and conduct yourself as a gentleman in this courtroom, I'll let you return. Until that time, you're going to remain out. Mr. Sheriff, he's in your custody. Remove him. Let him stay in close proximity where his counsel can confer with him.

DEFENDANT: What you going to do, Fred?

THE COURT: We're going to continue your trial. You go with these officers now. Let's proceed now on the *voir dire.*

(Defendant is removed from the courtroom.)

MR. FLOWERS: In view of that disciplinary action that appeared to be necessary to the Court, I wonder if we could take a little recess or maybe our lunch hour a little early. If he needs that time to get over it—

THE COURT: The Court will consider that motion as soon as we complete the *voir dire.* After that, the Court will allow counsel to go confer with him and see if he can behave in the courtroom. That's the fifth outburst this morning and this Court just cannot tolerate it. Let the record show that prior to this time the defendant was given warning that he would be removed if he did not conduct himself in proper manner in this courtroom; that he on two occasions after that interrupted the Court, told his witness to step down, did not advise his counsel to do so, started arguing with the Court in the presence of the Court and the Court finds it necessary at this time to remove him, the Court having informed him if he could behave in the courtroom, the Court would allow him to return. Any further direct?

MR. HODNETT: No, sir.

THE COURT: Let the record show it's 11:30 when this defendant was removed. Tr. at 68–69.

DEFENDANT: Judge, Your Honor, I'd like to have two black lawyers. I feel like these counsel are not going to represent me properly.

THE COURT: Please sit down, Mr. Sweezy.

DEFENDANT: Could I have two black lawyers?

THE COURT: Would you please sit down, Mr. Sweezy.

DEFENDANT: My name is Ivey.

THE COURT: Ladies and Gentlemen of the Jury, could I ask you to step in the jury room a minutes [sic], please.

JURY EXITS THE COURTROOM

THE COURT: Mr. Sweezy, I'm informing you that proper decorum in the courtroom does not permit this type action on your part. Should you do this one more time, I'm going to exclude you from the courtroom again. All right, Mr. Sheriff, let the jury come back in. Tr. at 82.

Q. Mrs. Grigg, is the individual that you described in the courtroom at this time?

A. Yes, he is.

Q. Step down and point him out.

MR. HODNETT: OBJECTION, Your Honor.

THE COURT: OVERRULED.

Q. Step down and point him out.

(Witness steps from the witness stand.)

A. This man right here—Mr. Sweezy.

DEFENDANT: My name is Ivey. Tr. at 84.

DEFENDANT: How can she say—

THE COURT: Mr. Sweezy, I have cautioned you.

DEFENDANT: That woman lying over there.

THE COURT: Just a minute. Ladies and Gentlemen of the Jury, step into the jury room, please.

JURY EXITS THE COURTROOM

THE COURT: Mr. Sheriff, take Mr. Sweezy in custody and remove him from the courtroom. When you can behave, we'll let you come back. We're going to try your case without you.

MR. HODNETT: Your Honor, we do OBJECT at this time. We feel like Mr. Sweezy needs to be in here.

THE COURT: OBJECTION OVERRULED. I have warned him eight times he's going to have to behave in this courtroom. As soon as he learns how to respect the Court, I'll let him come back in.

(Defendant removed from the courtroom.) Tr. at 112.

THE COURT: Sheriff, let the jury come back in.

JURY RETURNS TO THE COURTROOM

THE COURT: Ladies and Gentlemen of the Jury, the defendant is not present in this courtroom. The Court would remind you that the burden of proof in this action remains on the State at all times to prove his guilt beyond a reasonable doubt. You will bear this in mind at all times during this trial.

Tr. at 113.

JURY EXITS THE COURTROOM

THE COURT: Let the record show that the defendant was removed from the courtroom at 2:25 p.m. becuase [sic] of disruptive conduct and disobeyance to the Court's orders. Let the record further show it's about twelve minutes until three and the Court will instruct counsel to confer with their client and if he will behave, we'll let him come back in. You can instruct him if he is disruptive again—

MR. HODNETT: Yes, sir, we have been advising him.

(Defendant and his counsel present in the courtroom)

THE COURT: Let the jury come back in.

JURY RETURNS TO COURTROOM

Tr. at 128.

DEFENDANT: Do you believe in God, Mrs. Sweezy? Do you believe in God?

THE COURT: Ladies and Gentlemen of the Jury, step into the jury room please.

JURY EXITS THE COURTROOM

THE COURT: Let the record show this is the ninth occasion the Court had to call this man down. Mr. Sheriff, remove him from the courtroom.

DEFENDANT: Judge, Your Honor, I know my constitutional rights.

THE COURT: I'm so glad you do, but you're getting out of the courtroom. He's in your custody, Mr. Sheriff. Take him out of here.

(Defendant removed from the courtroom)

THE COURT: Let the record show that the defendant has been heretofore advised that if these disruptions persisted, he would be removed from the courtroom. And this is the third occasion this Court has had to do this. He interrupted his attorneys and started questioning the witness himself and was disrespectful to this Court and to this Court's orders. He has been heretofore advised that if he will respect the Court's orders and behave himself, the Court will allow him to return. This is the third occasion the Court has so advised him and he disobeyed the Court's orders again. The Court, therefore, concludes that it is necessary to remove him from the courtroom so the trial might continue. Let the jury come back in.

MR. HODNETT: May I be heard? First, I would like to apologize to the Court for Mr. Sweezy. Secondly, again I would have to OBJECT. We're getting to an awfully crucial part of the proceedings.

THE COURT: The Court is well aware of that, Mr. Hodnett. The Court wants him in here a lot worse than you do. But if he's not going to obey this Court, I cannot permit disruptive conduct and disobedience to this Court's orders and you know that as well as I do.

MR. HODNETT: I understand you have you [sic] obligation, but I wonder if it might be possible as soon as possible if again we might have a conversation with Mr. Sweezy and try to impress how important it is that he does stay in here.

THE COURT: I've tried to do this on three occasions now, and he has just disobeyed this Court, and I'm going to give you one more opportunity to go in there and talk to him. Warn him next time that I'm not going to be so merciful. Go talk to him.

(Defense attorney exit courtroom to confer with defendant)

Tr. at 135–36.

THE COURT: Mrs. Sweezy, you may step down for a minute. We'll call you back up.

(Defendant and his attorneys come into courtroom)

THE COURT: Let the jury come back in. Come back around, Mrs. Sweezy.

Tr. at 138.

THE COURT: Instruct your client to turn around and face the Court.

DEFENDANT: The Judge is a hypocrite.

THE COURT: I instructed that man to turn around and face the front.

Tr. at 139.

DEFENDANT: Did you tell them you're my son?

THE COURT: Ladies and Gentlemen of the Jury, I'm sorry, but I'm going to have to ask you to step into the jury room a minute.

JURY EXITS THE COURTROOM

DEFENDANT: What you trying to do, boy? I don't go for that damn shit. The world is coming to an end, Your Honor.

THE COURT: Sheriff, take him out.

DEFENDANT: God-a-mighty.

THE COURT: Take him out.

MR. HODNETT: I wonder if it might be possible he be placed in a room where he can hear. I know that they have connections in your chambers.

THE COURT: He's not going in there, I assure you.

MR. FLOWERS: There is a room right next door, Your Honor. I spoke to one of the deputies. He said he would sit in there if I would.

THE COURT: All right.

MR. FLOWERS: I'll sit in there with him.

(Defendant escorted from the courtroom)

MR. HODNETT: Your Honor, while the jury is out, I wonder if we could make a couple of motions at this point. When this witness is through, Your Honor, we have only two more witnesses. One is Mr. Sweezy and he has informed me that he is distraught and upset and highly nervous and sick.

THE COURT: He sounds pretty healthy to the Court.

MR. HODNETT: This is what he has informed me. I wonder if it might be possible to delay and have a continuance until tomorrow morning. We have another witness we'd like to call in. He is on call and we didn't think we were going to need him today. That's a psychiatrist from Raleigh, Jim Groce, and I feel like definitely, with all this happening, it's extremely important we have him. Mr. Flowers says we can have him in the morning.

THE COURT: That's asking a great deal of the Court. I'm not going to pat him on the head any more. He's not going to come back in this courtroom. I'll ALLOW your motion as to the psychiatrist. Do you have another witness after this gentleman here?

MR. HODNETT: Only Mr. Sweezy. He's the only one.

THE COURT: Well, you're going to have to bring him back in here and examine him today. I want to inform this man before he goes on the stand that I'm not going to tolerate the use of profanity or disrespect for this Court. You tell him that. If I have to bind and gag him, I'm not going to tolerate that, if I have to chain him to the chair up here. Let's finish this examination. Let the jury come back in.

JURY RETURNS TO COURTROOM

THE COURT: Members of the Jury, the defendant is not present in this courtroom and you will not consider that fact in your deliberations. Please recall at all times that the burden of proof is on the State to prove the guilt of the defendant beyond a reasonable doubt. All right, Mr. Solicitor, any further questions?

Tr. at 165–67.

JURY NOT PRESENT IN COURTROOM

THE COURT: Stand up, please, sir. I instruct you to stand up. I judge you again in contempt of this Court for your failure to stand when instructed to do so by the Court. Stand him up, Sheriff. Mr. Sweezy, the Court informs you that you have a constitutional right to take the witness stand and testify in your own behalf, if you desire to do so. You do not have to do so if you don't want to. The State has the burden of proving your guilt beyond a reasonable doubt, if you do not testify. You may testify in your own behalf if you desire to do so. If you do testify, the Solicitor may cross-examine you. The Court informs you of your constitutional right to testify if you desire to do so. It's entirely up to you. Do you elect to testify in your own behalf or do you desire to remain off the stand and leave the burden on the State to prove your guilt beyond a reasonable doubt? What says the defendant?

**490**

(No response)

THE COURT: Let the Court inquire. Both of you fully informed the defendant of this right in chambers?

MR. HODNETT: Yes, sir.

MR. FLOWERS: Yes, sir.

THE COURT: All right, Mr. Sweezy, it's up to you. Whatever you want to do. You may testify or not according to what you want to do.

(No response)

MR. FLOWERS: He tells me he can't testify.

DEFENDANT: I didn't tell him nothing.

THE COURT: Do you want to testify or do you not, Mr. Sweezy? You will answer this Court. Do you want to testify or do you not want to testify? You will answer me yes or no.

DEFENDANT: I fired Hodnett and Flowers here.

THE COURT: They are still your counsel. Do you want to testify or do you not? If you have anything you want to say to the jury, you may take the stand and so. [sic] Do you desire to testify in your own behalf? Answer me yes or no.

DEFENDANT: I don't think I have to testify in my own behalf. The facts speak for itself.

THE COURT: You do not want to testify, is that correct?

(No response)

THE COURT: Let the record show that the Court has given the defendant opportunity to answer and he informs the Court he does not have to testify and I take that to mean you do not want to testify.

DEFENDANT: It's not that I do not want to testify.

THE COURT: Do you want to testify in your own behalf?

DEFENDANT: Yeah, I'll testify in my own behalf.

THE COURT: Do you fully understand that the Solicitor can cross-examine you if you do testify? Do you understand that?

I'm informing you of that if you do testify. All right, if you want to testify—That's all right. Be seated now, and let the jury come in. Take the pencil from the defendant.

JURY RETURNS TO COURTROOM

THE COURT: All right, call your next witness.

MR. HODNETT: Ivey, go up and be sworn.

Tr. at 169–71.

Q. Who is your half-brother?

A. Jeremiah Brooks.

Q. What time did you get up to his house?

A. What time?

Q. Un huh.

A. We just want to know the facts, I didn't break in her house. I wasn't in her house. I wasn't in her home. I didn't go in her home. I think the facts speaks for itself. My witnesses proved I wasn't there, so we don't have to carry it no farther.

THE COURT: When the Judge addresses you, Mr. Sweezy, you will listen to him. Just answer your attorney.

A. I went by Annie Mae's place and I was in Hickory.

THE COURT: Ask him the next question.

Q. How long were you up at your brother's house?

A. Until that morning.

Q. Did you ever leave your brother's house?

A. I don't have to answer that question. I've said enough.

(Defendant gets up out of the witness chair)

THE COURT: Just a minute, Mr. Sweezy. Be seated there. Sit him down there.

(Deputies seat defendant in witness chair)

DEFENDANT: I don't have to say nothing.

MR. HODNETT: You don't want to say anything else? Your Honor, if he wants to come down.

THE COURT: The State has to have an opportunity to cross-examine him.

CROSS EXAMINATION: (By Mr. Morris)

Q. What have you been tried and convicted of, Mr. Sweezy?

(No response)

THE COURT: You will answer that question, Mr. Sweezy.

(No response)

THE COURT: I again instruct you to answer the Solicitor's question.

A. We want facts, I take the Fifth Amendment on that, because we want the facts.

THE COURT: Ladies and Gentlemen, you will step in the jury room, please.

JURY EXITS THE COURTROOM

DEFENDANT: May I step down?

THE COURT: No, you may not. I find this defendant is again in direct contempt of this Court for refusal to answer the Court's order. This is the third time, now, I find you in contempt. Now, are you going to answer the Solicitor's questions or not? Tell me right now.

(No response)

THE COURT: Did you hear me? I said for you to answer me.

DEFENDANT: I don't have to answer no questions.

THE COURT: All right, I again adjudge you to be in contempt of Court for the fourth time. Mr. Solicitor, do you desire to examine this man any further?

MR. MORRIS: No, sir.

THE COURT: Let him step down, Sheriff. Let the jury come back in.

DEFENDANT: I know you're trying to kill me in prison and all that. Trying to railroad me.

THE COURT: Remove him from the courtroom, Mr. Sheriff. Take the defendant out of the courtroom.

(Defendant removed from courtroom)

JURY RETURNS TO COURTROOM

THE COURT: Ladies and Gentlemen, the Court will again instruct you, the defendant is not present in Court, and you will not consider that fact in your deliberations. The burden [of] proof remains on the State throughout this case to prove the guilt of the defendant beyond a reasonable doubt. Is there anything further with the exception of the one witness tomorrow? Tr. at 174–76.

THE COURT: I'm going to let you all go confer with your client for the fourth time and see if he will behave in here and I'll let him come in. Sheriff, I'm going to ask you to sit next to him, if he elects to come in.

(Defendant enters the courtroom with his attorneys)

THE COURT: Let the jury come in.

(During argument of Mr. Hodnett):

DEFENDANT: Mr. Mike, I'm sick.

(On request of counsel, defendant was removed from courtroom)

(Leaving) DEFENDANT: I would like to hear the rest of this. I'm sick, Your Honor. I have a headache.

Tr. at 197.

A review of the foregoing excerpts from the trial transcript reveals that petitioner stated he felt he was being railroaded, which is probably a frequent feeling of persons charged with crime. In light of this feeling, it is not surprising that he was abrasive and brusque to the judge, as shown by the episodes of refusal to speak to the court; a request that his attorneys be replaced; a request for black lawyers; an assertion that the prosecutrix was lying; a reference to the judge as a hypocrite; snubs by turning his back to the judge on two occasions; references to the proceeding as a "Kangaroo Court;" a refusal to stand; a sullenness when asked if he desired to testify; a refusal to be cross-examined; and cursing during the rendition of the verdict. It is obvious from the transcript that petitioner disliked his family, referring

to his parents as "Mr. Sweezy" and "Mrs. Sweezy," and this accounts for such things as his outburst about his mother's dislike for him; his desire not to call his father as a witness; his disruption of his father's testimony when a reference was made to petitioner's small arms; and a similar outburst against his mother over the same thing in which he apparently insinuated she was lying; a disassociation of himself from his father, "Mr. Sweezy," by stating his (petitioner's) name was Ivery; and an implication of incest to himself when his brother was on the stand. The same conclusion that petitioner was essentially an aggressive, hostile person rather than an incompetent one is shown by the generally rude, sometimes demanding, sometimes condescending, and sometimes sarcastic tenor of his remarks toward counsel, the court, and the witnesses. The following serve to illustrate this point: "Take them two women off, just take them two women off . . . ;" "It don't make any difference what I said . . . I whispered when I come in;" "I know my constitutional rights, my right to speak for myself;" "Don't put that man on the stand;" "You can call him off the stand now;" "How can she say—that women lying;" "What are you trying to do, boy? I don't go for that damn shit;" "I didn't tell him nothing;" "I don't think I have to testify on my own behalf, the facts speak for itself;" "I don't have to answer that." In light of the above perspective on the events of which petitioner complains, it simply does not appear that incompetence was a problem from which petitioner suffered at trial.

In addition to the above perspective, and even more importantly, the above episodes definitely evidence a rational as well as factual understanding of the proceedings, the basis of competence under *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). This is because virtually all were closely related to either the outcome of the case or the procedures involved, *i.e.,* getting a jury, using witnesses, protesting testimony and verdict, getting a lawyer replaced, and protesting the judge's action. Therefore, while petitioner's ac-

tions and remarks have been characterized by him as irrational, that word is appropriate only to the extent it describes actions by petitioner which were not in his best interest. However, rationality from a standpoint of competence is not determined by foolishness or wisdom, and, for this additional reason, the events on which petitioner relies to establish his incompetency at the time of trial and the duties on counsel are not probative on the point.

Several other factors also underscore the conclusion that petitioner was competent at the time of the trial. The first consists of the actions of counsel during trial. His attorneys were the men who had gotten him a pretrial review and who had given notice of a possible insanity defense. Therefore, had the at-trial events indicated incompetence to them with their knowledge of petitioner's background and their interest in him, they surely would have explored the matter. That they did not think this is shown not only by their failure to do that but their feeling that he was susceptible to being reasoned with as shown by their actions after he was removed. The next factors are the actions of Judge Friday. He ultimately held petitioner in contempt four times for his actions during the course of trial and, in one instance, had occasion to note that petitioner "sounds pretty healthy to the court." Surely Judge Friday tired of the repeated necessity for intervention and would have certainly explored the possibility of mental illness as a cause for it, with the resulting termination of the case at that point, had there been the least cause to do so. Yet he did not. Therefore, the personal observation of petitioner's counsel and the trial judge, on the facts of this case, provide exceptionally strong indicia of petitioner's competence. See, *e.g., United States v. Clark,* 617 F.2d 180 (9th Cir.1980). Finally, petitioner's disruptions, although not appropriate in themselves, were followed by actions which showed an orientation to the proceedings even though they were not always actions which would be described as correct. After initially being warned to use a lower tone, petitioner's

voice apparently lowered for the rest of the day except for two remarks immediately afterwards. When questioned what he said upon court beginning the next day, he denied saying anything and then, in effect, stated he was doing what the court had told him to do—whisper. When he broached the subject of replacing counsel, his remarks were related to this purpose. Upon being threatened with gagging, he desisted. Prior to the court's morning recess when warned about his conduct, he again desisted. When removed for calling a witness a liar, he was readmitted after counsel conferred with and advised him. When the judge again directed his removal, he claimed a constitutional privilege for his action. When addressed about his right to testify, his response was oriented to this matter. While testifying, he either responded to directions to testify or asserted he had a right not to answer. In light of the above fact, as well as those which have preceded it, it must be concluded that petitioner was competent at the time of trial, and neither counsel nor the court was under duty to further interrupt the proceedings to check his competency.

In addition to the facts not supporting petitioner's position, the main legal authority relied on by him is also distinguishable. In *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the trial judge was alerted to the necessity of a *sua sponte* hearing because of the following factors: (1) Drope's defense was dependent on his wife, whom he tried to strangle immediately prior to trial; (2) he shot himself during trial in a possible attempt to commit suicide; (3) his pretrial competency report was mixed, describing him in part as having difficulty in thinking and as frequently dealing in irrelevancies rather than the matters under discussion; and (4) the failure of the pretrial report to speak specifically to Drope's competence to stand trial. None of these are present in our case. The same is true of *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). There, counsel insisted that the accused's sanity at the time of trial was in issue, elicited testimony from his mother that he

was insane at the time of the trial, and argued to the judge that his insanity existed at the time of the trial. Here, of course, counsel made no such suggestion. Finally, in *Kibert v. Peyton,* 383 F.2d 566 (4th Cir. 1967), counsel testified that petitioner's behavior prior to trial was not oriented toward the discussions about his case and that he was not responsive generally; at trial he gave his assent to pleas of guilty by merely nodding his head and stating nothing; and within twenty days following trial was found to be not responsible mentally. Again, none of these factors appear in the instant case.

On the basis of the foregoing discussion, this court concludes that petitioner was competent at the time of his trial; that is, he had the ability to consult with his attorneys with a reasonable degree of rational understanding and a rational, as well as a factual, understanding of the proceedings against him. *Dusky v. United States, supra; Pate v. Robinson, supra.* Accordingly, petitioner's contention as to his competency will be dismissed.

█ Petitioner contends that his counsel's failure to move for a determination of petitioner's capacity to stand trial, at the time of the trial and in light of petitioner's irrational and abnormal behavior, denied petitioner effective assistance of counsel.

█ The test of effective assistance of counsel, as stated in *Marzullo v. Maryland,* 561 F.2d 540, 543 (4th Cir.1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978), is: "Was the defense counsel's representation within the range of competence demanded of attorneys in criminal cases?" To show ineffective assistance, a convicted defendant "generally must establish that his counsel's error was so flagrant, that a court can conclude that it resulted from neglect or ignorance rather than from informed professional deliberation." *Id.* at 544. *Wyatt v. United States,* 591 F.2d 260 (4th Cir.1979); *Springer v. Collins,* 586 F.2d 329 (4th Cir.1978); *Goodson v. United States,* 564 F.2d 1071 (4th Cir.1977); *United States v. Burkley,* 511 F.2d 47 (4th Cir.1975).

This contention will afford the petitioner no relief. As previously recited, this court concluded that petitioner was competent at the time of his trial; that is, he had the ability to consult with his attorneys with a reasonable degree of rational understanding and a rational, as well as a factual, understanding of the proceedings against him. *Dusky v. United States, supra.* Petitioner's at-trial behavior, as described above, negates incompetence, as his behavior is more explicable in terms of an angry, hostile personality rather than in terms of incompetence. Petitioner's disruptions during the trial were followed by actions which showed an orientation to the proceedings even though they were not always actions which were appropriate. Virtually all of petitioner's actions and responses were closely related to either the outcome of the case or the procedure involved, such as getting a jury, using witnesses, protesting testimony, getting a lawyer replaced, protesting the judge's action, lowering the tone of his voice, claiming a constitutional privilege, and asserting he had a right not to testify.

Several other factors underscore the conclusion that petitioner was competent at the time of the trial, and neither counsel nor the court was under duty to further interrupt the proceedings to check his competency. Petitioner's attorneys had obtained pretrial diagnostic evaluations which showed he was competent to stand trial. However, the attorneys gave notice of a possible insanity defense which they did not pursue. Therefore, had the at-trial episodes indicated incompetence to them with their knowledge of petitioner's background and their interest in him, they surely would have explored the matter. The attorneys obviously did not believe petitioner incompetent, as shown by their failure to interrupt the trial and their indications that petitioner was susceptible to being reasoned with, as demonstrated by their actions after he was removed from the courtroom on four occasions.

From a review of the transcript of the trial, this court concludes that petitioner's representation was well within the range of competence demanded of attorneys in criminal cases and that the attorneys' handling of petitioner's case was based on professional deliberation and not from neglect or ignorance. Accordingly, petitioner's allegations (A) and (B) will be dismissed.

Petitioner's allegation (C), that he was on drugs before, at, and after trial will afford him no relief. This claim is not supported by any factual data which would tend to show that the claim, if true, had any causative effect as to petitioner's conviction. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Parker v. Ross,* 470 F.2d 1092 (4th Cir.1972); *Noble v. Sigler,* 351 F.2d 673 (8th Cir.1965), *cert. denied,* 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966). Accordingly, this allegation will be dismissed.

Petitioner's allegation (D), that he was convicted by an all-white jury, is purely conclusory, not supported by any factual data which would show that the claim, if true, had any causative effect as to petitioner's conviction. *Darr v. Burford,* 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950); *Parker v. Ross, supra; Raines v. United States,* 423 F.2d 526 (4th Cir.1970). Accordingly, this allegation will be dismissed.

■ Petitioner's allegation (E), that there was insufficient proof of his guilt, will afford him no relief. Petitioner was convicted of first-degree burglary, which is defined as the unlawful breaking and entering of an occupied dwelling or sleeping apartment in the nighttime with the intent to commit a felony therein. It is well established that the mere pushing or pulling open of an unlocked door constitutes a breaking. *State v. Tippett,* 270 N.C. 588, 155 S.E.2d 269 (1967). The witness, Mrs. Grigg, testified: "The door was not locked, because I had just come back from the shop at 10:00 p.m. The door was closed all the way. I shut the door myself. It's not possible that it was open, I closed the door." This was sufficient evidence of a breaking. The entry into the Griggs' house was unlawful, that is, without the permission of the occupants. Mrs. Grigg testified as to her surprise in seeing someone entering her

enclosed porch at that time of night. When confronted by the petitioner, she began to retreat into her home and to scream for her husband. This was sufficient evidence to show that the petitioner entered the Griggs' house without the permission of the occupants. The intent to commit a felony is shown by the evidence that petitioner had partially entered the enclosed porch of the Griggs' home; that he had a lady's stocking covering his right hand and arm; when confronted by Mrs. Grigg, he motioned to her to keep quiet; and, when she began to scream, he fled. Under the requirements of *State v. Moore*, 277 N.C. 65, 175 S.E.2d 583 (1970), this evidence was sufficient to show intent to commit larceny at the time of the breaking and entering. In applying the standards set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), this court concludes that proof of guilt was sufficient to convince a rational trier of fact beyond a reasonable doubt. Therefore, this allegation will be denied.

Petitioner's allegation (F), that the grand jury should not have indicted him and that a transcript of trial should be subpoenaed, will afford the petitioner no relief. In regard to the matter of the grand jury, this was discussed in relation to allegation (E), and further comment is not necessary. The court was supplied with a copy of the trial transcript by the respondent, which obviates the necessity of a subpoena. Accordingly, this allegation will be dismissed.

### III. CONCLUSION

In accordance with the Fourth Circuit's decision in *Gordon v. Leeke*, 574 F.2d 1147 (4th Cir.1978), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978), this court has carefully examined the file to determine whether the petitioner could prove any set of facts in support of his claim that would entitle him to relief. The court has found no basis in fact for petitioner's allegations, and his petition will be denied.

Petitioner has duly filed an application to proceed in *forma pauperis,* and he will be allowed to proceed as an indigent.

A Judgment denying the writ, in accordance with the findings and conclusions contained in this Memorandum of Decision, shall be entered simultaneously herewith.